UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

The Pond Guy, Inc., a Michigan
corporation, and Jason Blake d/b/a The
Pond Guy, a Michigan resident,

        Plaintiffs,

v.

Aquascape Designs, Inc., an Illinois
corporation, and Gregory G. Wittstock, an
Illinois resident,

        Defendants.

_____/

Case No.13-13229

Honorable Nancy G. Edmunds

## OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION [16 & 30]

Currently before the Court is Plaintiffs' motion for a preliminary injunction. A hearing was held on this matter on May 29, 2014, which was continued to and completed on June 9, 2014. For the reasons set forth below, the Court DENIES Plaintiffs' motion.

## I.   FINDINGS REGARDING BACKGROUND FACTS

1. Plaintiffs in this case are The Pond Guy, Inc., and its principal, Jason Blake ("Blake"). Defendants are Aquascape Designs, Inc., and its principal, Gregory Wittstock ("Wittstock"). Both parties are in the "water features" business, which entails the installation and servicing of landscape design elements that have water as their focus, such as ponds and waterfalls of varying sizes. The parties also sell parts and equipment necessary for the maintenance and installation of water features.

2.   The conflict in this case arises from the use of the phrase "The Pond Guy." Defendants applied for registration of the phrase "The Pond Guy" ("the mark") as a trademark on August 5, 1999. Pls.' Ex. 101, Defs.' USPTO Application. Plaintiffs applied for registration of the same phrase as a service mark on October 1, 1999. Pls.' Ex. 102, Pls.' USPTO Application. Plaintiffs, in their registration application identified January 1996 as the earliest use of the mark, while Defendants' application claims December 1990 as their first use of the mark. Defendants' application was pending for approximately two-and-a-half years, and on December 18, 2001, the U.S. Patent and Trademark Office (the "USPTO") issued a final action denying Defendants' application. Defs.' Ex. 555, USPTO Final Office Action. Plaintiffs' eventually received federal registration from the USPTO on March 4, 2003 for the "The Pond Guy" service mark for "aquatic management services" under International Class 37. Pls.' Ex. 113, Service Mark Registration.

3.   Plaintiffs use the mark as the name of their business, and as a brand name insofar as the products they produce and sell are branded with the mark. *See, e.g.,* Defs.' Ex. 551, The Pond Guy Catalog. As Blake testified, Plaintiffs also sell products produced by other companies, including by Defendants.[1] Blake also testified that Plaintiffs use the mark to identify him, personally.

4.   The parties are in agreement that Defendants have used and continue to use the mark in several ways, but they have never sold any products branded with the mark. Defendants primarily use the mark to identify Wittstock. *See, e.g.*, Defs.' Ex. 720-743, Various Marketing Material. That is, in most if not all of Defendants print marketing and

---

[1] All references to testimony are to the testimony given at the hearings held on May 29, 2014, and June 9, 2014.

educational materials, Defendant Wittstock includes a message to the consumer, which is "signed" with Defendant Wittstock's signature, immediately followed by the phrase "a.k.a. 'The Pond Guy'", printed in the same cursive font as the signature. *Id.* Defendants' more recent use of the mark on the internet will be addressed below, as it is central to Plaintiffs' motion.

5.   Blake testified that Plaintiffs participate in the consumer retail market. Wittstock and Jeff Payton, one of Wittstock's employees, testified that Defendants' sales are made in the wholesale market, and indirectly in the retail market. That is, the overwhelming majority of sales made by Defendants are made to one or another type of intermediary that then re-sells Defendants' products. During his direct examination, Mr. Payton explained that even when an end-use retail customer goes to Defendants' website to make a purchase, the transaction is actually facilitated through the Shopatron program, which coordinates a sale by a retailer in close geographic proximity to the buyer.

6.   Defendants have, however, established a history of at least two marketing channels, targeting both the re-selling intermediary and the retail consumer. Wittstock testified that  his goal since 1995 has been to produce marketing material directed to the ultimate consumer of his products. Defendants' marketing activity has consisted of various catalogs distributed from the mid-1990s through the present, educational seminars and "how-to" books relating to the installation of water features, and as of 2012, their social media activity. According to Wittstock, the educational materials are geared towards both professional contractors and the "do-it-yourself" inclined homeowners. The record supports a conclusion that the mark was used in Defendants' print media marketing at least as early

3

as 1996 or 1997. Defs.' Ex. 558, 1996 Catalogue, and Defs.' Ex. 583, 1997 Parade of Ponds.

7.   The parties dispute Defendants' participation in the direct retail sales market, and the evidence of retail sales by Defendants consists mainly of the testimony of Wittstock and Mr. Payton on the issue. Regardless of the dispute as to Defendants' retail sales activity, the issues in this case are less about direct sales than they are about direct marketing, particularly via the internet, which is discussed in greater detail below.

8.   Defendants did use the mark as the name of the publishing company through which they produced many of their printed marketing and educational materials. Specifically, Defendants called their publishing company "Pond Guy Publications." Defendants unsuccessfully applied for registration of the "Pond Guy Publications" mark in 2003 and received a final rejection from the USPTO in 2004 which concluded that the requested registration would likely cause confusion with Plaintiffs mark, "The Pond Guy." Plaintiffs concede that Defendants' publishing arm closed in 2007. Pls.' Ex. 122, USPTO Office Action. While Defendants' use of the mark as the name of its publishing company may be relevant for a ruling on damages, it is not pertinent to the instant motion.

9.   Over the approximately fifteen years that the parties have co-existed, there has been relatively little interaction between them, beyond Plaintiffs' use of Defendants' wholesale business. However, in 2000, 2001, and 2005 there was some correspondence between the parties regarding each other's perceived trademark infringement. Pls.' Ex. 104-106, 110-111, & 124, Correspondence between the parties. Nothing came of those mild flare ups, beyond, perhaps, establishing notice of the parties respective positions on the use of the mark.

4

10.    Wittstock's testimony confirmed that Defendants have relatively recently increased their use of the internet as a marketing tool, and have been in the process of filming a reality television show about their business to air on the Nat Geo Wild channel. The show was previously titled "Pond Guys", but has since been re-titled, and as of this writing it is scheduled to be called "Pond Stars." Defendants have no control over the name of the show.

11.    Additionally, Plaintiffs have established that on two occasions, individuals were confused by the Defendants' use of the mark. One instance involved a confused customer, and the other instance involved a confused vendor. Pls.' Ex. 145 & 148. The third instance of confusion that Plaintiffs attempt to establish is that of Wittstock himself, by way of an internet post in which Blake was "tagged." This is not evidence of confusion, as there are any number of more plausible explanations for the tagging than the one suggested by Plaintiffs, including that Blake was simply inadvertently added to the post. Plaintiffs, therefore, have established two instances of confusion**.**

12.    Plaintiffs filed the lawsuit and the instant motion for a preliminary injunction, seeking extremely broad injunctive relief. Defendants oppose the motion, and NGC Network US and NGC Network International ("Nat Geo"), were permitted to file an *amicus curiae* brief regarding the harmful effect the requested relief would have on the continued production of the television program mentioned above.

## II. FINDINGS REGARDING THE BASES OF PLAINTIFF'S PRELIMINARY INJUNCTION MOTION

### A. Marketing Channels, the Internet, and Prior Use of the Mark

13.   Defendants have established a variety of marketing channels, both in traditional printed forms and on the internet. There is no dispute that Defendants have a long history of using the mark to market their products and services to professional contractors and retailers, undoubtedly dating to before Plaintiffs' trademark registration.

14.   As to the Defendants' use of traditional media as a means of marketing to both the retail and wholesale markets, the testimony of both Blake and Wittstock supports a finding that Defendants engaged in aggressive traditional media marketing almost from the inception of their business and that Wittstock used the mark as means of identifying himself personally at marketing events such as seminars and conventions by speaking it aloud. As to the geographic extent of that, however, the evidence presented to the Court does not establish with any certitude a set territory. That being said, Mr. Payton's testimony on behalf of Defendants regarding the distribution of printed marketing media including catalogs, magazines, and books in the tens-of-millions of copies from the mid-1990s though the mid-to-late-2000s is strongly suggestive of a national or near-national geographic use. However, as Defendants have largely phased it out, their use of print media is less pertinent to this motion than their use of the internet, beyond, of course, as a benchmark for establishing a consistent use by Defendants of the mark in all of their marketing efforts across various media dating back to the inception of their business.

15.   During the hearing, both parties made reference to the history of their respective presence on the internet. Neither party, however, has submitted sufficient

evidence to the Court detailing exactly what their historical internet presence consisted of. Seeing as this is a key issue in dispute, the Court turns to the Internet Archive, found at https://archive.org/web/, for the taking of judicial notice. As a resource the accuracy of which cannot reasonably be questioned, the Internet Archive has been found to be an acceptable source for the taking of judicial notice. *See, In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.,* 2013 WL 6869410 (S.D.N.Y. Dec. 30, 2013) (taking judicial notice of certain reports by way of an internet archive search and citing *Juniper Networks, Inc. v. Shipley*, 394 Fed. App'x 713, at *1 (Fed.Cir.2010) (indicating that the Internet Archive may be an appropriate source for judicial notice), and; *Martins v. 3PD, Inc.*, 2013 WL 1320454, at *16 n. 8 (D.Mass. Mar. 28, 2013) (taking judicial notice of "the various historical versions of a website available on the Internet Archive at Archive.org as facts readily determinable by resort to a source whose accuracy cannot reasonably be questioned").

16.   The Court takes judicial notice of the parties' historical internet presence as represented by the Internet Archive. Specifically, with regard to Defendants' use of the phrase "the Pond Guy" as an identifying mark for Wittstock directed at both end-use consumers and professional contractors and retailers, the Court finds that Defendants have been making such a use of the mark on the internet since at least February 29, 2000. *See,* https://web.archive.org/web/20000229123655/http://www.aquascapedesigns.com/p-ondguy2.htm, and; https://web.archive.org/web/20000229140817/http://www.aquascaped-signs.com/pondguyfrm.htm.

17.   This finding is based on both the tone and content of the above cited archival internet material, which on one page identifies Wittstock as "The Pond Guy" and on the other page is clearly directed at an end-use consumer. An example of language appearing

7

on the archived website that clearly has as its intended audience the end-use retail consumer is the following entreaty: "[d]on't delay in joining the thousands of people who have enhanced their property and their lives with water features." *Id.*

18.   Plaintiffs sought to introduce expert opinion testimony regarding Defendants' use of the mark in their internet marketing and how that use could negatively impact Plaintiffs' business. The Court allowed Plaintiffs' proposed expert to testify, however, beyond accepting as true that Defendants use the mark in the back-end code of their various websites - a fact which Defendants do not deny, so much as they attempt to explain it away - the Court does not accept or adopt Plaintiffs' proposed expert's opinions, primarily because despite his qualifications, his opinions were based almost entirely on speculation, and therefore do not meet the statutory requirements of Federal Rule of Evidence 702.

### B. Genericness

19.   While the Court is not at this time ruling on the issue of whether or not the mark is generic, the issue of genericness is key to the resolution of the instant motion, and evidence on this point was submitted to the Court. Defendants point out that a Google search reveals numerous other companies across the United States that incorporate the phrase "the pond guy" into their business names. Also in support of this assertion, Defendants offer a list of nineteen of their own customers that use the mark as a business name. Defs.' Ex. 565. Plaintiffs object to Defendants' evidence on this point, but they do not deny that there are other companies using the mark. Instead, Plaintiffs' play down the importance of such use, to wit Blake testified that many of these companies are small businesses serving only the localities in which they are established. The Court sees Plaintiffs' explanation as actually supporting Defendants' position, in that if there are

8

numerous small businesses using the mark across the country, and they all provide the same or similar services, that fact goes toward the proposition that people everywhere understand the mark in its primary, generic meaning.

20.   Furthermore, Blake testified that he regularly refers to his employees as "pond guys" and "pond gals," and that when he was first starting his business, upon arriving at a customer's house, his arrival would be announced by the statement "the pond guy is here."

## III.   CONCLUSIONS OF LAW

### A.  The Standard on a Motion for a Preliminary Injunction

In the Sixth Circuit it is firmly established that the district courts balance the following factors in addressing a motion for a preliminary injunction:

> (1) the likelihood that the movant will succeed on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest will be advanced by issuing the injunction.

*Miller v. City of Cincinnati*, 622 F.3d 524, 533 (6th Cir. 2010). Furthermore, "[n]one of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

### B.  Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits

Plaintiffs' complaint raises numerous claims in addition to their federal trademark claim, however, Plaintiffs' motion for a preliminary injunction is based wholly on the trademark claim. In assessing Plaintiffs' likelihood of success on the merits, the Court looks to what is required of a Lanham Act plaintiff in order to demonstrate trademark infringement.

9

The Sixth Circuit has stated that such a plaintiff must show that the defendant's use of the mark "is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 412 (6th Cir. 2006) (citing *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir.1997). Furthermore,

> [i]n order to determine confusion, this Court examines the eight so-called *Frisch* factors: "(1) strength of the plaintiff's mark, (2) relatedness of the goods or services, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) likely degree of purchaser care, (7) the defendant's intent in selecting its mark, and (8) likelihood of expansion of the product lines." *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 548 (6th Cir.2005) (citing *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir.1982), cert. denied, 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982)). "These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Id.* (citing *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir.1991) ).

*Gen. Motors Corp.*, 468 F.3d at 412.

The above factors, however, "imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Id.* Moreover, "not all of these factors may be particularly helpful in any given case." *Id.,* 468 F.3d at 413.

The Court also notes that while the above factors comprise the test for determining whether or not consumer confusion is likely in a given case, consumer confusion is not the only factor in the likelihood of success on the merits analysis required for a preliminary injunction in a trademark infringement case. In particular, in this case, Defendants argue fair use, prior use, and acquiescence on the part of the Plaintiff.

### 1.  The doctrines of laches and acquiescence

As an initial matter the Court will address Defedants' arguments based on Plaintiffs' long delay in brining suit. Defendants argue that Plaintiffs' claims should be barred by the doctrine of laches. The Sixth Circuit, however, has explicitly stated that while laches 'precludes a plaintiff from recovering damages, it does not bar injunctive relief." *Kellogg Company v. Exxon Corporation*, 209 F.3d 562, 568-69 (6th Cir.2000). As such, in order to successfully defend against Plaintiffs' preliminary injunction motion along this line of argument, Defendants must establish acquiescence.   *Id.*

The Sixth Circuit has noted that "[a]lthough both laches and acquiescence require proof that the party seeking to enforce its trademark rights has unreasonably delayed pursuing litigation and, as a result, materially prejudiced the alleged infringer, acquiescence requires more." *Id.* Furthermore, "[t]o deny injunctive relief in trademark litigation, ... some affirmative conduct in the nature of an estoppel, or conduct amounting to 'virtual abandonment,' is necessary." *Id.* (quoting *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 366 n. 2 (6th Cir.1985)).

Here, Defendants note that Plaintiffs offered to attempt to reach a "cross license agreement" in a 2005 letter as evidence that Plaintiffs acquiesced in Defendants' use of the mark. The Court does not see it that way. In fact, a reasonable reading of the 2005 letter leads the Court to the conclusion that Plaintiffs sought to address what they deemed to be infringing activity without immediately resorting to litigation, which is a measured way of expressing displeasure with Defendants' activity without unnecessarily escalating the situation. It is not, however, an indication of acquiescence. Additionally, Defendants argue that Plaintiffs' sale of Acquascape products indicates acquiescence. Again, Defendants miss the mark. There is no indication that the products produced by Defendants that

Plaintiffs sold were marked with the "The Pond Guy" mark, which would be strong evidence of acquiescence; indeed, Defendants sell no products at all that have "The Pond Guy" actually inscribed on the product or the label. Plaintiffs, therefore, in selling Defendants' products, did not acquiesce in any infringing activity. Plaintiffs can continue their commercial relationship with Defendants without acquiescing in Defendants' allegedly infringing behavior.

The Court finds that Defendants have not shown the affirmative conduct required by the Sixth Circuit to establish acquiescence sufficient to bar injunctive relief.

As the Court has found that laches is not an effective defense and that the record does not support Defendants' claims of acquiescence, Plaintiffs' arguments regarding progressive encroachment to justify a delay in filing suit need not be addressed.

### 2.  Defendants' prior use of the mark

Second, the Court will address Defendants' prior use of the mark. The Sixth Circuit has made clear that "the determination of prior use of a service mark presents a mixed question of law and fact." *Allard Enterprises, Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 355 (6th Cir. 1998) ("*Allard I*"). That being said, it is settled law that an unregistered senior user of a mark does have rights in the mark that are not vitiated by way of the junior user's registration. *Allard Enterprises, Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 572 (6th Cir. 2001) ("*Allard II*") (noting that "[t]he territorial rights of a holder of a federally registered trademark are always subject to any superior common law rights acquired by another party through actual use prior to the registrant's constructive use.").

12

As noted above, the Court has found that Wittstock has been using the phrase "The Pond Guy" to identify himself, since at least 1996 or 1997, which is two or three years prior to Plaintiffs' application for registration of the "The Pond Guy" mark.

Assuming, *arguendo,* that Defendants' evidence of prior use establishes some rights under the *Allard* cases, Plaintiffs claim that while Defendants may have previously been using the mark within the limits set by their prior use, the current use of the mark by Defendants has exceeded any rights that the prior use may have created. That is, Plaintiffs contend that Defendants' use of the mark for their social media marketing campaign is outside the bounds set by Defendants' use of the mark prior to Plaintiffs' registration.

The evidence has established that Defendants' use of the mark in their printed materials consisted of many millions of catalogs and magazines distributed in the U.S. and Canada, and that Wittstock himself spoke the mark as an identifier in countless personal appearances. The evidence also establishes that from the inception of Defendants' marketing initiatives in the 1990's, Defendants attempted, and in large part succeeded in saturating the market on as wide a scale as their budgets would allow.

Complicating this issue, however, is the fact that in the twenty-plus years that Wittstock has been using the mark in print, communication technology has been entirely revolutionized. As *Allard II* notes, a focus on "territorial rights" and the "geographic extent" of the prior use is of limited utility when determining whether Defendants' use of the mark on the internet, a use completely divorced from the concept of geography, falls within the bounds meted out by his mid-1990's use of the mark. On that point, the *Allard II* court stated that "due to the paucity of caselaw addressing concurrent trademark rights and internet use, the district court may want to consider cases addressing the role of national

13

advertising by parties with concurrent trademark rights." *Allard II*, 249 F.3d at 575. While that decision was issued some thirteen years ago, there does not appear to have been much development of the caselaw on this issue in general, and the specific circumstances of this case may present a matter of first impression. Indeed, the *Allard II* court went on to point out that while there may be some straightforward presentations of this issue, it is more complicated when the junior user is the holder of the federal registration, as is the case here. *Id.*

The Court's determination that Defendants have been using the mark on the internet since at least February 2000 - which is three years prior to Plaintiffs' registration of the mark - somewhat simplifies the analysis because it allows for an evaluation of Defendants' use of the mark on the internet over time, as opposed to a forced comparison between Defendants' use of the mark in traditional media with their use on the internet and avoids a futile attempt at applying concepts of geographic territoriality to the internet.

In light of the Court's discussion below, however, on the issue of the mark's strength, the Court will not now rule definitively on the extent to which Defendants' prior use of the mark on the internet entitles them to the unfettered use of mark on the internet going forward, except to say that the facts currently established regarding Defendants' internet presence at least as early as February 2000 do not bode well for Plaintiffs' ultimate success on the merits in this case.

**3.  Fair Use**

14

Defendants briefly mention the fair use doctrine as a defense to Plaintiffs' claims. Defendants do not fully develop their arguments on this point, however a brief analysis of the issue leads the Court to the conclusion that the fair use doctrine is of no avail to Defendants. That is, "[i]n evaluating a defendant's fair use defense, a court must consider whether [the] defendant has used the mark: (1) in its descriptive sense; and (2) in good faith." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 612 (6th Cir. 2009) (citing *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 920 (6th Cir.2003)). Here, the Court finds that while Defendants are using the mark, in part, in its descriptive sense, they are also in large part using it to personally identify Wittstock. Such a use is not purely descriptive of the products and services provided by Defendants. *Id.* Thus, the fair use defense is not applicable to Defendants' use of the mark.

### 4. The eight *Frisch* factors do not weigh in favor of a finding that Plaintiffs are likely to succeed on the merits as to Defendants' use of the mark

Having addressed ancillary arguments regarding Plaintiffs' success on the merits, the Court now turns to the heart of a Lanham Act trademark infringement preliminary injunction analysis, the eight so-called *Frisch* factors.

#### a. Strength of Plaintiffs' mark

Defendants argue that Plaintiffs' mark is weak because it is generic. Plaintiffs argue that the mark has become incontestible under the Lanham Act, which is true. However, 15 U.S.C. § 1065 explicitly states that "no incontestable right shall be acquired in a mark which is the generic name for the goods or services or a portion thereof, for which it is registered." 15 U.S.C. § 1065(4) (West). Therefore,

> [t]he mark's incontestable status...does not protect it from a challenge...premised on a claim that it has become generic. *See* 15 U.S.C. § 1065. Nevertheless, because

the mark at issue was a federally registered mark, there is a presumption that the term is non-generic and the defendant bears the burden of overcoming this presumption.

*Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 405 (6th Cir. 2002) (internal citations omitted). To that end, Defendants argue that the mark is generic because it is primarily a descriptive term, more readily used to indicate the type of products and services the parties provide than to designate the source of a given product.

In the Sixth Circuit, "the test for whether a term is generic and therefore ineligible for trademark protection is 'whether the public perceives the term primarily as the designation of the article.'" *T. Marzetti Co. v. Roskam Baking Co.*, 680 F.3d 629, 633-34 (6th Cir. 2012) (citing *Gen. Conference Corp. of Seventh–Day Adventists v. McGill*, 617 F.3d 402, 413 (6th Cir.2010). Furthermore,  "[i]f a mark is primarily associated with a type of product rather than with the producer, it is generic." *Nartron Corp.*, 305 F.3d at 404.

The *Nartron* court also noted that "[g]eneric terms are also called 'common descriptive' terms, as distinguished from 'merely descriptive' terms," and that a "'merely descriptive' term may be registered if it has become distinctive of the applicant's goods in commerce but that "registration may be cancelled if the mark has become "the common descriptive name of an article".  *Id.*, 305 F.3d at 404, n. 7. (internal quotation marks and citations omitted). The *Nartron* court goes on to provide the following explanation of the difference between "common" and "merely" descriptive terms:

> A "merely descriptive" mark, as opposed to a "common descriptive" one, is often said to identify a characteristic of the thing. It is very similar to an adjective. Judge Friendly illustrated the distinction between a generic and a merely descriptive mark with the "Deep Bowl Spoon" example:
>
>> "Deep Bowl" identifies a significant characteristic of the article.
>> It is "merely descriptive" of the goods, because it informs one

16

> that they are deep in the bowl portion.... It is not, however, "the common descriptive name" of the article (since) the implement is not a deep bowl, it is a spoon.... "Spoon" is not merely descriptive of the article, it identifies—the article—(and therefore) the term is generic.
>
> See Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 10, n. 11 (2d. Cir.1976), quoting Fletcher, Actual Confusion as to Incontestability of Descriptive Marks, 64 Trademark Rep. 252, 260 (1974). Where a mark registered on the federal principal registry is "merely descriptive" and has become incontestable pursuant to 15 U.S.C. § 1065, the mark is presumed to have acquired a secondary meaning. See Liquia Controls Corp. v. Liquid Control Corp., 802 F.2d 934, 936 (7th Cir.1986).

Id.

The mark at issue, "The Pond Guy," is unarguably a descriptive term. The question the Court will be tasked with resolving when ruling on the merits of this case, then, is whether the mark is a "merely descriptive" term, in which case, as a registered trademark it is entitled to protection, or a "common descriptive" term, in which case it is generic, and its registration may be subject to cancellation.

On the record established for the purposes of the preliminary injunction motion, the mark may indeed be the common descriptive term for a person with expertise in ponds. That is, "pond" is clearly a common descriptive term, generally accepted to mean a "small body of still water of artificial formation, made either by excavating a hollow in the ground or by embanking and damming up a watercourse in a natural hollow." Oxford English Dictionary, available at http://www.oed.com/view/Entry/147571?rskey=8LVWBN&result=1# eid. "Guy" is generally accepted as a colloquial synonym for "man." Oxford English Dictionary, fourth definition, available at http://www.oed.com/view/Entry/82780?rskey=4TEt aq&result=2#eid.

17

Furthermore, the use of the word "guy" can have different, generally acceptable connotations. Particularly enlightening on this issue is an example of the phrase in common usage provided by Nat Geo as *amicus curiae*. Nat Geo, in providing examples of uses of the phrase that may cause difficulty for it should the Court grant Plaintiffs' requested relief, offers a scenario where a customer states "I don't think we need a pool guy for that, I think we need a pond guy." *Amicus* br., 10. Such a statement communicates an understanding that in common parlance appending the word "guy" to a noun signifies a person with expertise related to that noun. Indeed, Blake freely admits to referring to his employees as "pond guys and pond gals."

In all fairness, Blake also testified that he felt that upon his arrival at a client's home the issuance of the announcement that "the pond guy is here" is analogous to a homeowner proclaiming "the Orkin Man is here." The Court is not convinced of the equivalence of the two phrases, however, as the listener only knows why the "Orkin Man" is there if he or she is familiar with the Orkin brand, whereas upon hearing the statement "the pond guy is here" or "the pond guys are here" the listener has an immediate understanding of, at the very least, the general reason for the visit.

Another hypothetical variation on this theme that highlights the potential genericness of the phrase would be "le gars de l'étang," which, roughly, is "the pond guy" in French. As most Americans do not speak French, the announcement of the arrival of "le gars de l'étang" at your home in, say, Cincinnati, would be met with puzzlement if you did not already know that there was a company with that name in the business of servicing ponds. As noted above, however, in plain English, "the pond guy" gives rise to a set of expectations specific to the products and services the parties provide, without needing to

18

know anything more about the parties themselves, whether you are in Los Angeles, Cincinnati, or any other English speaking North American city.

In contrast, for example, the phrase "the big pond guys" would be a *merely* descriptive use, because the addition of the word "big" to the term "pond guys" adds a description of the characteristics of the term - much as in the "Deep Bowl Spoon" example above - and would communicate to the listener something more specific, and uniquely identifying about the individual arriving at their door.

The Court is of the opinion that it would not take much evidence to establish that such a phrase is commonly descriptive, and a signifier of a type of person, that is a person with pond expertise. Thus, "the pond guy" as a phrase is likely  "primarily associated with a type of product [or servicve] rather than with the producer [or service provider], [and may be] generic." *Nartron Corp.*, 305 F.3d at 404. Therefore, despite its incontestible status as a trademark, the Court cannot say with any degree of certainty that "The Pond Guy" mark will escape being deemed a generic mark. It will be up to the parties, however, to make the case one way or the other on this issue, either on motions for summary judgment or at trial.

In light of the above, on the current record, this factor weighs in favor of Defendants.

### b.  Relatedness of the goods or services

The goods and services in this case are related, indeed, they are very similar if not identical. Both companies provide the products and services necessary to install a water feature as a part of a consumer's landscaping. The area where the goods and services differ is educational material. Defendants, in addition to their main business line, have sold how-to books, published magazine style printed materials with tips for professional landscapers and homeowners, and they continue to host seminars and trade shows.

Defendants use and have used the mark in many if not all of their marketing efforts. That being said, the educational materials all relate back to the main business line, and as such, this factor weighs in Plaintiffs' favor.

### c.  Similarity of the marks

The marks are exactly the same when described as being comprised of the phrase "The Pond Guy." However, the actual presentation of the marks in printed material, on the internet, and in the case of Plaintiffs, on products, are immediately distinguishable. Defendants' use of the mark has traditionally been as an add-on to Wittstock's name at the end of stylized messages to Defendants' customers in marketing materials and appears as a handwritten signature in quotation marks. Plaintiffs' mark, on the other hand,  is presented in a block font, with a design intended to convey ripples in a pond emanating from the top of the "d" in the word "pond," with the phrase "we know ponds" or "simple solutions" appearing beneath the mark. That being said, when Defendants use the mark on the internet - which is a key use in this case - there is generally no special font used in its presentation, and many of the internet uses occur in the background code where the consumer never sees it.

The marks, therefore, despite some differences in presentation are sufficiently similar that this factor favors Plaintiffs.

### d.  Evidence of actual confusion

Evidence of actual confusion is an important factor, especially in light of the fact that the whole point of the *Frisch* analysis is to determine the likelihood of consumer confusion. That being said, Plaintiffs' evidence of actual confusion is anecdotal at best. Plaintiffs offer three examples of consumer confusion, one being  an incident involving a software vendor

20

who confused the parties in his sales pitch, another being a social media post apparently by Defendant Wittstock wherein Plaintiff Blake was "tagged," and the third being a message left with Plaintiffs that was intended for Defendants. The Sixth Circuit has stated that "four incidents is not a considerable quantum of evidence of actual confusion, and minimal or isolated instances of actual confusion are, obviously, less probative than a showing of substantial actual confusion." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1120 (6th Cir. 1996). Here we have three examples, and one of them, that of Defendant Wittstock "tagging" Plaintiff Blake is not even an example of consumer confusion, as Defendant Wittstock can hardly be classified as a consumer in this instance, and he may have had any number of reasons for tagging Blake in the post – although he denies that tagging happened at all.

Acknowledging the importance of this factor, but faced with the paucity of evidence provided by Plaintiffs in support of their position, the Court finds that this factor weighs in favor of Defendants.

### e. Marketing channels used

The marketing channels used factor is at the crux of Plaintiffs' arguments. The Court stated above that the record supports a finding that Defendants have marketed to both contractors and retailers, and also to end-use consumers by way of their website since at least February 2000. That being said, there is no doubting that Defendants have ramped up their use of the internet as a marketing tool since the year 2000. Specifically, Defendants have developed a heavy presence on the various social networking platforms and increased the sophistication of their official company website. Indeed, Plaintiffs' proposed expert reported on Defendants' use of the words "the" "pond" and "guy" in both

21

the visible content of their internet posts and the back-end coding of their websites. Plaintiffs claim, but offer no evidence, that this increase in internet use is resulting in less consumer traffic on their website. Plaintiffs' proposed expert's report goes into great technical detail regarding Defendants' use of the mark and its constituent parts as it relates to website and search engine optimization, which are techniques designed to maximize a website's chances of appearing at or near the top of search results, but as noted above, Plaintiffs' proposed expert did not report on Plaintiffs' website traffic or sales numbers as they relate to Defendants' internet activity. Plaintiffs are complaining that Defendants are outpacing them, however, there is no mention of Plaintiffs' efforts to counter Defendants' internet strategy with one of their own, nor is there any evidence of the effect that strategy is having on either party's sales.

Furthermore, it does not appear that Defendants are using the mark in this context any differently than described above, that is, to identify Defendant Wittstock as a person with pond expertise. Whether the use is explicit, as at the top of a Facebook page, or concealed in the code, the use of the mark by Defendants is all geared towards maintaining Wittstock's persona as "the pond guy" on the internet to retailers, contractors, and the end-use retail consumer, which they have been doing, albeit to a lesser extent, since at least 2000.

This factor, therefore, weighs in Defendants' favor.

### f.  Likely degree of purchaser care

The likely degree of purchaser care is a factor that does not fall in favor of either party. Given the market that the parties are participating in, purchasing behavior cannot be easily homogenized. That is, some purchasers may not exercise very much care when

purchasing, say, a replacement water filter. However, when making a more substantial purchase, for instance, when having a large water feature installed in a back yard or contracting for a long-term service and maintenance package, a consumer is likely to exercise a much greater degree of care. Therefore, the degree of purchaser care is as varied as the parties products and services, rendering this factor neutral.

### g.  Defendants' intent in selecting its mark

The uncontested evidence is that Defendants selected and used the mark prior to, or at the very least, contemporaneously with Plaintiffs' first use of the mark. As such, there can be no finding that Defendants selected the mark with any ill intent towards Plaintiffs and their business. This factor, therefore, weighs in favor of Defendants.

### h.  Likelihood of expansion of the product lines

Both parties have broad product lines and a national presence thanks to the internet. Plaintiffs conflate expansion of product lines with expansion of marketing efforts, pointing to Defendants' increased internet marketing activity as support for their position on this factor. The factor calls for an examination of product lines, not marketing activity, which is more properly considered under the "marketing channels used" factor, above.   As Defendants point out, both parties have full product lines and have been in the water feature business for over twenty years; thus, this factor is neutral.

### i.  *Frisch* factor conclusion

With four factors weighing in favor of Defendants, two in favor of Plaintiff, and two neutral, the Court concludes that there is a very low likelihood of confusion between the parties' products and services. Additionally, the Court's findings on the potential genericness of the mark undermine not only the outcome of Plaintiffs' position on "strength

23

of the mark," but on also on the overall conclusions as to Plaintiffs' likelihood of success on the merits.

The *Frisch* factors, therefore, favor a ruling for Defendants.

### C. Irreparable Harm, Harm to Others, and The Public Interest

#### 1. There is little to no evidence of the potential for irreparable harm arising from Defendants' use of the mark

In the Sixth Circuit, a showing of a likelihood of confusion or possible risk to a plaintiff's reputation is sufficient to create a presumption of irreparable harm in the preliminary injunction analysis in the context of trademark infringement. *Lucky's Detroit, LLC v. Double L, Inc.*, 533 F. App'x at 555 (citing *Wynn Oil Co. v Am. Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir. 1991). Defendants argue that the presumption set forth above was done away with in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). *eBay*, however, was a patent case, and the Sixth Circuit has not applied the rule laid out there to trademark cases.

Regardless, as the Court has found that there is a very low likelihood of confusion and Plaintiffs have not demonstrated a risk to their reputation, the irreparable injury prong of the preliminary injunction analysis is not satisfied.

#### 2. There is evidence suggesting that the requested injunction would cause serious harm to others

The Court allowed Nat Geo to file an *amicus* brief in this case. Nat Geo's brief raises both the potential for an injunction to abridge its First Amendment rights and the serious financial concerns that would arise should this Court enjoin the use of the mark. In short, Nat Geo points out that much of the show has already been shot and an injunction of the

24

sort sought by Plaintiffs would require a large amount of time and money to ensure that no offhand use of the phrase "pond guy" makes it into the final version. Seeing as the show is about men who install ponds, that may be a Sisyphian task. Additionally, Nat Geo's concerns regarding its free speech rights are very serious. Because the Court will not be issuing an injunction at this time, however, Nat Geo's First Amendment interests are protected.

### 3.   The public's interest is in not granting the requested injunction

As the Court has voiced its concern regarding the possible generic nature of the mark, the public's interest lies in not granting the injunction. The Sixth Circuit has stated that, "[t]o allow protection for generic terms would grant "a monopoly, since a competitor could not describe his goods as what they are." *Nartron Corp.*, 305 F.3d at 404-05. Additionally, enforcing trademark rights in a generic term is harmful to society as it stifles innovation by curtailing the free exchange of ideas relating to the generic but trademarked term. This factor, therefore, weighs in favor of not granting the requested injunction.

In light of the above, Plaintiffs have not satisfied the requirements for a preliminary injunction, and their motion is DENIED.

### D.  Defendants' use of "Pond Guy Publications" Was Likely an Infringing Use

The evidence before the Court suggests that Defendants' use of the mark as the name of its publishing arm may have violated Plaintiffs' rights in the mark. In particular, the USPTO's refusal to grant Defendants a registration in the "Pond Guy Publications" mark on the grounds that it would likely cause confusion with Plaintiffs' mark is highly probative on this issue. However, as it is not contested that the Pond Guy Publications arm of Aquascape is no longer in operation, an injunction against its continued operation would

25

serve no purpose. This issue, however, will be relevant at the damages stages of this lawsuit.

## IV.   CONCLUSION

For the reasons stated above the Court DENIES Plaintiffs' motion for a preliminary injunction.

SO ORDERED.

s/Nancy G. Edmunds_____
Nancy G. Edmunds
United States District Judge

Dated:  June 24, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 24, 2014, by electronic and/or ordinary mail.

s/Carol J. Bethel_____
Case Manager